**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIDE BY SIDE, INC., an Illinois | ) | No. 12 CV 7204 |
| corporation d/b/a "Sidetrack," | ) | |
| ARTHUR JOHNSTON, WILLIAM | ) | |
| STADT, JAMES KAYS, and DAVID | ) | |
| OAKES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Joseph Parker brings this action against his former employer, Defendant Side-by-Side, Inc. d/b/a Sidetrack ("Sidetrack"), and four former coworkers (the "Individual Defendants"). Plaintiff asserts claims against Sidetrack for sexual harassment, religious harassment, and retaliation under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Plaintiff also asserts a claim for intentional infliction of emotional distress ("IIED") against Sidetrack and the Individual Defendants. Before the Court are Defendants' motions for summary judgment. (*See* R. 46, 52, 54, 57, 60.)

For the following reasons, the Court grants Sidetrack's motion for summary judgment (R. 46) with respect to Plaintiff's sexual harassment, retaliation, and IIED claims, but denies it with respect to Plaintiff's religious harassment claim. In addition, the Court grants the Individual Defendants' motions for summary judgment on Plaintiff's IIED claims. (R. 52, 54, 57, 60.)

1

# BACKGROUND

## I.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1"is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). The nonmoving party then must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. L.R. 56.1(b)(3)(B)). The nonmoving party also must present a separate statement of additional facts, if any, that it contends require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)).

In general, the aim of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("[S]tatement of material facts did . . . not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture . . . ."). The rule makes the summary judgment process less burdensome on district courts by requiring the parties to nail down the relevant facts and the way they propose to support or refute them. *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). "When a responding party's statement fails to dispute the facts set

forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco,* 559 F.3d at 632. In sum, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka,* 686 F.3d at 398.

Here, Plaintiff responded to Sidetrack's and Arthur Johnston's joint Local Rule 56.1(a) statement of material facts, but he did not respond to Defendants William Stadt's, James Kays', or David Oakes' separate Local Rule 56.1(a) statements. Stadt, Kays, and Oakes argue that, as a result, the Court should deem admitted the facts set forth in their Local Rule 56.1(a) statements. (*See* R. 78, Indiv. Defs. Reply Br. at 1.) Many of the facts presented in their Local Rule 56.1(a) statements, however, mirror the facts provided in Sidetrack's and Johnston's joint Local Rule 56.1(a) statement. For any overlapping facts, the Court has deemed Plaintiff's responses to Sidetrack's and Johnston's joint Local Rule 56.1(a) statement as responses to Stadt's, Kays', and Oakes' corresponding statements of fact. For the remaining facts, however, the Court has deemed Plaintiff's failure to respond as admissions. *See Cracco,* 559 F.3d at 632.

Additionally, Plaintiff directed his Local Rule 56.1(b)(3) statement of additional facts to Sidetrack and Johnston, but not to Stadt, Kays, and Oakes. Consequently, Sidetrack and Johnston filed a joint response to those additional facts, but Stadt, Kays, and Oakes did not. The same counsel represents all Defendants, however, and a review of Sidetrack's and Johnston's joint response shows that it fully protects Stadt's, Kays', and Oakes' interests. The Court, therefore, has considered Plaintiff's additional facts, where appropriate, in deciding Stadt's, Kays', and Oakes' motions for summary judgment.

Finally, the Court has not considered statements of fact set forth by either side that fail to comply with Local Rule 56.1, and it has deemed as admitted those statements of fact to which

the opposing party failed to properly respond. *See Cracco,* 559 F.3d at 632. With these

principles in mind, the Court turns to the relevant facts.

## II.     Relevant Facts

Sidetrack is a bar located in Chicago's Lakeview neighborhood that caters primarily to

single gay men. (*See* R. 47, Defs. L.R. 56.1 Stmt. ¶¶ 3, 6.)[1] Jose "Pepe" Pena and Defendant

Arthur Johnston co-own Sidetrack (*id.* ¶ 4), and the remaining Individuals Defendants are

employees: David Oakes is a bartender; Jimmy Kays is a night manager; and Bill Stadt is

Sidetrack's facilities manager. (*Id.* ¶¶ 13-15.) Plaintiff began working for Sidetrack as part of its

security team on August 4, 2010. (*Id.* ¶ 9.) Plaintiff's duties included checking patrons'

identifications, picking up glassware around the bar, and generally responding to any security

issues. (*Id.*)

At the beginning of his employment, Plaintiff signed Sidetrack's Anti-Harassment and

Nondiscrimination Policy (the "Anti-Harassment Policy"), which prohibits sexual and

discriminatory harassment. (Defs. L.R. 56.1 Stmt. ¶ 11.) The Anti-Harassment Policy sets forth

several options an individual may pursue to address offensive behavior, including self-help,

mediation, submitting a formal complaint, and seeking reassignment. (*See* R. 47-5, Anti-

Harassment Policy at 3-5.) The Policy designates Johnston and Sidetrack's attorney, Stephen

Herseth, as mediators to assist individuals in handling any issues related to sexual and

discriminatory harassment and as the company's contacts should an individual want to submit a

formal complaint. (*Id.* at 3-4.) Under the Policy, an individual may choose any of the options

for addressing harassment outlined in the Policy and may "continue to bring any work-related

problem to his or her supervisor" in addition to Johnston, Pena, and Herseth. (*Id.* at 3.)

---

[1] Citations to the parties' Local Rule 56.1 statements refer collectively to the statement of fact at issue and the opposing party's response. For clarity, the Court uses this citation form only for facts that are undisputed or deemed admitted due to a party's failure to comply with Local Rule 56.1.

Although Plaintiff signed the Anti-Harassment Policy verifying that he read and understood it, Plaintiff states that he felt rushed in his review and did not completely understand the Policy. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 29 (citing 47-6, Pl. Dep. 25:8-28:4).)  It is unclear whether Sidetrack gave Plaintiff a copy of the Anti-Harassment Policy for his records.  (*Id.*; *see also* R. 79, Defs. L.R. 56.1(b) Resp. ¶ 29.)

On May 18, 2011, Plaintiff's boyfriend at the time, Kevin DuJan, sent a letter to Sidetrack claiming that Sidetrack employees had harassed him on May 5-6, 2011 because he is a Christian and a Republican. (Defs. L.R. 56.1 Stmt. ¶¶ 12, 22-26; *see also* R. 47-4, DuJan Letter at DEF000194.)  In his letter, DuJan asserted that Sidetrack employees also had harassed Plaintiff because of DuJan's beliefs and Plaintiff's relationship with him.  (Defs. L.R. 56.1 Stmt. ¶ 26.)  DuJan claimed that Oakes, in particular, repeatedly harassed Plaintiff about his relationship with DuJan and threatened to have Plaintiff fired if the relationship continued.  (*See* DuJan Letter at DEF000190-93.)  DuJan filed a religious discrimination complaint against Sidetrack with the City of Chicago's Commission on Human Relations on June 2, 2011.  (*See* R. 48-3.)

Sidetrack hired an attorney, Brett Rappaport, to investigate DuJan's allegations.  (Defs. L.R. 56.1 Stmt. ¶¶ 21, 27.)  Rappaport met with several individuals during his investigation, including Plaintiff.  (*Id.* ¶ 27.)  In advance of his meeting with Rappaport, Plaintiff submitted a seven-page personal statement describing several incidents of sexual and religious harassment he purportedly had suffered at the hands of Sidetrack employees.  (*Id.* ¶ 28.)  After receiving Plaintiff's statement, Sidetrack placed him on paid leave purportedly to allow the investigation into DuJan's and Plaintiff's allegations to proceed and to ensure that Plaintiff felt comfortable during the pendency of the investigation.  (*Id.* ¶ 29.)  There is some evidence, however, that

5

Sidetrack placed Plaintiff on leave at least in part because Plaintiff was excessively using his intercom to report his activities and location.  (*See* Pl. L.R. 56.1(b) Resp. ¶ 29.)

On August 26, 2011, Sidetrack terminated Plaintiff for cause.  (*Id.* ¶ 49.)  According to Sidetrack, it terminated Plaintiff because he refused to meet with Sidetrack's attorney regarding its investigation, was insubordinate, and made false allegations of harassment.  (*See id.  But see* Pl. L.R. 56.1(b) Resp. ¶ 49.)  Plaintiff, however, claims that Sidetrack terminated Plaintiff in retaliation for complaining about the harassment he endured.  Following his termination, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 24, 2012.  (*See* Defs. L.R. 56.1 Stmt. ¶ 50.)

Plaintiff initiated this suit against Sidetrack and the Individual Defendants on September 10, 2012.  (*See id.*; *see also* R. 1, Compl.)  Plaintiff asserts claims against Sidetrack for sexual harassment, religious harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964.  Plaintiff also asserts claims against the Individual Defendants—and Sidetrack as their employer—for IIED.  The Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331, and it has supplemental jurisdiction over Plaintiff's intentional IIED claims pursuant to 28 U.S.C. § 1367.  Venue is proper in this District because the alleged events giving rise to Plaintiff's claims occurred within the Northern District of Illinois.  (*See* Defs. L.R. 56.1 Stmt. ¶ 2.)

### A.    Sexual Harassment Allegations

Plaintiff's allegations of sexual harassment primarily concern Defendant Stadt, although he also alleges incidents of sexual harassment involving Defendants Kays and Oakes and two Sidetrack employees who are not defendants.

### 1.    Defendant Stadt[2]

Plaintiff alleges that Stadt first began harassing Plaintiff during his job interview. According to Plaintiff, Stadt stated that he had seen Plaintiff around the area and commented on how much he liked the shirts Plaintiff wore.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 8.)  Plaintiff considered the comments to be sexual.  (*Id.*)  He felt like Stadt was picking him up in a bar rather than interviewing him.[3]  (*Id.*)

Stadt continued to harass Plaintiff after Sidetrack hired him.  On August 8, 2010, four days after Plaintiff began working at the bar, Stadt and a companion approached Plaintiff during his smoke break and began talking to Plaintiff about Stadt's "playroom," which Plaintiff understood to be a "sex dungeon type scenario."  (*Id.* ¶ 9; *see also* Pl. Dep. 243-44.)  Stadt and his friend described for Plaintiff the activities that occurred in Stadt's playroom, including sodomy and flagellation, genital torture, insertion of objects into a person's urethra or anal cavity, rolling in feces and urine, partial asphyxiation, group sex, and the use of genital rings. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 9.)  Plaintiff felt uncomfortable during the discussion and recalls attempting to change the subject.  (*Id.*; *see also* Pl. Dep. at 244-45.)  Later that night, Stadt texted Plaintiff, "Thanks for the converaation [sic].  It ended my night well.  Look forward to showing u the playroom.  Hugs."  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 9.)

---

[2] Sidetrack disputes many of Plaintiff's allegations because Stadt denied that the incidents occurred or that they occurred as Plaintiff asserts.  (*See, e.g.,* Defs. Resp. to Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 10-14.)  On summary judgment, however, the Court must resolve any genuine factual disputes in favor of Plaintiff, as the non-movant.  *See CTL ex rel. Trbatoski v. Ashland Sch. Dist.,* 743 F.3d 524, 528 (7th Cir. 2014).  Accordingly, the Court accepts Plaintiff's version of the facts over Stadt's version where Plaintiff has provided evidentiary support.

[3] Sidetrack disputes that Stadt interviewed Plaintiff alone, arguing that Sidetrack's general manager, Chuck Hyde, would have interviewed Plaintiff in conjunction with Stadt.  (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 8; R. 79, Defs. Resp. to Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 8.)  Sidetrack, however, does not dispute that Stadt made comments about Plaintiff's appearance during the interview that Plaintiff considered to be sexual.

Over the next several months, Stadt made lewd comments to Plaintiff and touched him inappropriately on multiple occasions. In August or September 2010, Stadt and his friends, who had come to the bar as patrons, catcalled Plaintiff, whistling and hooting at him and calling him "fresh meat." (*Id.* ¶ 10.) Stadt then slapped Plaintiff on the buttocks. (*Id.*) In October 2010, an intoxicated Stadt danced "grindingly" against Plaintiff in an empty barroom, blocking Plaintiff from completing his work. (*Id.* ¶ 11.) Stadt asked "Can't you just pretend I'm not your manager?" while dancing provocatively against Plaintiff. (*Id.*) According to Plaintiff, Stadt danced against him this way on several occasions while Plaintiff was working. (*Id.* ¶¶ 11-12; *see also* Pl. Dep. at 272.)

In October or November 2010, Stadt approached Plaintiff while he was working near the entrance to Sidetrack and told Plaintiff to turn around and let Stadt see his buttocks. (*Id.* ¶ 12.) Later that same night, Stadt told Plaintiff to follow him into the courtyard, and after determining that no one was watching from the bar, grabbed Plaintiff's buttocks and commented that Plaintiff's "ass feels really great in those jeans." (*Id.*) Stadt then rubbed Plaintiff's genitals. (*Id.*) Additionally, in November 2010, Stadt texted Plaintiff to "dance" and then gestured for Plaintiff to dance for Stadt and his friends. (*Id.*)

In January 2011, Plaintiff participated in a Sidetrack tradition in which the six newest employees dress in underwear as "Baby New Year's" and dance on the bar. (*See* Pl. Dep. at 272.) After Plaintiff participated in the bar dance, Stadt told Plaintiff that he had taken photographs of the dance and had captured "great shots" of Plaintiff's buttocks. (Pl. L.R. 56.1(b) Stmt. ¶ 13.) Stadt commented to Plaintiff that he had been "enjoying" the photographs at home, which Plaintiff understood to mean that Stadt had masturbated to the images. (*Id.*; *see also* Pl. Dep. at 273.) Stadt then told Plaintiff that he had "all sorts of outfits" Plaintiff could wear in his

playroom and complained that Plaintiff had not yet visited the playroom.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 13; *see also* R. 73-1, Pl. Resp. to Stadt Interrogs. at 4.)

In March 2011, Stadt suggested that Plaintiff wear a leather outfit to Sidetrack's Mardi Gras party.  Stadt showed Plaintiff images on his cell phone of leather gear Plaintiff could borrow, including a harness, mask, gag, dog collars, jockstraps, shorts, and boots.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 14.)  Stadt then told Plaintiff that he could model the clothing in the playroom.  (*Id.*)

On May 6, 2011, Plaintiff asked to speak privately to Stadt regarding comments that another Sidetrack employee purportedly had made about DuJan's and Plaintiff's religious beliefs.  While Plaintiff was explaining the problem to Stadt, Stadt placed his hand on Plaintiff's knee, and then began moving his hand towards Plaintiff's genitals.  (*Id.* ¶ 14; *see also* Pl. Dep. at 274-77.)  According to Plaintiff, Stadt's hand was centimeters away from touching his genitals through his jeans when Plaintiff stood up and walked toward the door.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 14.)

Plaintiff made comments regarding Stadt's harassing conduct to Jimmy Kays and Jason Gall as early as November 2010.  (*Id.* ¶ 31.)  Kays, the night manager, had supervisory authority over employees when neither Johnston nor Chuck Hyde was present at the bar.  (*Id.*)  Jason Gall was a "bartender manager."  (*Id.* ¶ 30.)  According to Plaintiff, he understood from other employees that he could approach any manager about harassment concerns.  (*Id.* ¶ 30.)  Both Kays and Gall brushed off Plaintiff's concerns about Stadt, stating "that's just Bill."  (*Id.* ¶ 31.)

### 2. Defendant Kays

Plaintiff and Kays became friends several years before Plaintiff began working at Sidetrack.  (*See* Defs. L.R. 56.1 Stmt. ¶ 56.)  On September 14, 2010, Kays texted Plaintiff,

"Wish you were here to cuddle" around 5:30 a.m. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 17; *see also* R. 50-3, Kays' Texts at DEF000917.) Kays texted Plaintiff again several hours later apologizing for his "drunken texts." (*See* Kays' Texts at DEF000918.)

In December 2010, after drinking with coworkers after the bar closed, Kays told Plaintiff to drive him to the train station. (*Id.* ¶ 58.) On the way, Kays made lewd comments about how he wanted to perform oral sex on Plaintiff. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 17.) According to Plaintiff, he "slightly joking[ly], slightly forceful[ly]" told Kays that he should not make those comments because he is Plaintiff's manager. (*Id.*; *see also* Pl. Dep. 291-92.) Kays— also "half joking[ly]"—responded that, as Plaintiff's manager, he could tell Plaintiff what to do. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 17; *see also* Pl. Dep. 292, 295.) Kays then instructed Plaintiff to drive to Kays' apartment so that Kays could pick up his luggage. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 17.)

Plaintiff alleges that after entering Kays' apartment, Kays pushed him against a wall, removed Plaintiff's pants, and began performing oral sex on him. (*Id.*) According to Plaintiff, he did not enjoy the sex, and he felt "stuck" and did not know what to do. (*See* Pl. Dep. at 294.) Plaintiff states that Kays eventually stopped when Plaintiff did not ejaculate, lay down on the bed, and went to sleep. Plaintiff initially lay down too because he felt "tipsy," but ne eventually left and drove home. (*Id.*) Plaintiff did not report the incident with Kays to anyone at Sidetrack. (*See* Defs. L.R. 56.1 Stmt. ¶ 58.)

Kays' account of the incident differs significantly from Plaintiff's account. According to Kays, Plaintiff voluntarily accompanied Kays to his apartment with the intention of engaging in sexual conduct with Kays. (*See id.* ¶ 58; *see also* R. 47-9, Kays Dep. at 72-75.) Plaintiff fully disrobed upon entering Kays' apartment, which Kays interpreted to mean that Plaintiff consented

to Kays' sexual advances.  (*See* Defs. L.R. 56.1 Stmt. ¶ 58; *see also* R. 47-9, Kays Dep. at 72-75.)  The parties also dispute whether Plaintiff and Kays had a sexual relationship before this incident in December 2010.  Defendants contend that Kays and Plaintiff had engaged in sexual activity on one other occasion before December 2010.  (Defs. L.R. 56.1 Stmt. ¶ 56.)  Plaintiff, however, asserts that although he spent the night at Kays' apartment once, they did not have sex.  (*See* R. 72, Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 56.)  For purposes of summary judgment, the Court resolves these factual disputes in Plaintiff's favor.

### 3.  Defendant Oakes

 In the fall of 2010, Plaintiff accompanied Oakes to his apartment after both men had been drinking at Sidebar.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 18.)  Plaintiff continued to drink at Oakes' apartment and eventually lay down on the bed because he felt dizzy.  (*Id.*)  Plaintiff alleges that he later awoke to find Oakes attempting to perform oral sex on him.  (*Id.*)  Plaintiff testified that Oakes abruptly stopped, and Plaintiff then "passed out."  (*Id.*)  Plaintiff did not report the incident with Oakes to anyone at Sidetrack.  (*See* Defs. L.R. 56.1 Stmt. ¶ 52.)

Plaintiff alleges that several months later, Oakes mentioned Plaintiff in his discussion with other Sidetrack employees regarding the number of new hires with whom Oakes had engaged in sexual conduct.  (Defs. L.R. 56.1 Stmt. ¶ 54.)  According to Plaintiff, Oakes described himself as the Sidetrack "welcome wagon" because he had had sex with seventeen new Sidetrack employees.  Oakes then turned to Plaintiff and said, "right, Joe?"  (*Id.*)  Plaintiff claims that Oakes' comment embarrassed him in front of his co-workers.  (*Id.*)  Plaintiff does not recall whether he reported this incident to anyone at Sidetrack, but he testified that he was "sure that the people in other rooms and managers heard it."  (*See* Pl. Dep. at 305.)[4]

---

[4] Oakes denies that he engaged in sexual conduct with Plaintiff and that he referred to himself as the Sidetrack "welcome wagon."  (*See* Defs. Resp. to Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 18.)  On

### 4. Other Sidetrack Employees

Plaintiff alleges that in August or September 2010, Daniel Laster, another Sidetrack employee, followed Plaintiff to his car after work one night, rubbed his body against Plaintiff, and kissed Plaintiff before Plaintiff could push him away. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19.) Plaintiff pushed Laster away and told Laster not to kiss him again. (*See* Pl. Dep. at 377.) After Plaintiff spurned Laster's advances, Laster began criticizing Plaintiff and making false complaints about him at work. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19; *see also* Pl. Dep. at 377-80.) Plaintiff asserts that Laster also touched him inappropriately on several occasions. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19; *see also* Pl. Dep. at 408.) According to Plaintiff, Laster would purposely brush by Plaintiff trying to rub his hand across Plaintiff's buttocks or genitals at work. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19; *see also* Pl. Dep. at 408.) Plaintiff testified that he believes he reported Laster's conduct to Kays in the fall of 2010. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19; *see also* Pl. Dep. at 408-09.)

Additionally, Plaintiff asserts that a Sidetrack bartender, Juan Carlos Ramirez, propositioned Plaintiff for sex in February 2011. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19.) Leading up to the incident, Plaintiff, Ramirez, and several other Sidetrack employees had been drinking heavily at another bar. According to Plaintiff, after they left the bar, Ramirez asked Plaintiff to come to his apartment and have sex with him. (*Id.*; *see also* Pl. Dep. at 382-85.) Plaintiff declined. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19.) Following the incident, Ramirez became "hypercritical of everything [Plaintiff] was doing and he made a big show of telling everyone what [Plaintiff] needed to improve at work." (*See id.*; *see also* Pl. Dep. at 387.)

---

summary judgment, however, the Court must resolve this factual dispute in Plaintiff's favor. *See CTL,* 743 F.3d at 528.

Plaintiff cannot recall whether he reported the incident with Ramirez to Kays or anyone else at Sidetrack. (*See* Pl. Dep. at 410-11.)

## B. Religious Harassment Allegations

Plaintiff is a practicing non-denominational Christian. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 20; Defs. L.R. 56.1 Stmt. ¶ 69.) Plaintiff bases his claim for religious harassment on purportedly anti-Christian video clips Sidetrack played during comedy nights, offensive performances ridiculing Christians at special events, and degrading comments Sidetrack employees, particularly Lee Trudell and Defendant Oakes, made to Plaintiff because of his religion and his relationship with DuJan.

First, Plaintiff contends that video clips Sidetrack played during its weekly "Comedy Nights" contained "anti-Christian and Christian mocking elements." (*See* R. 71-1, Pl. Resp. Br. at 16.) DuJan testified that the purportedly offensive videos included the following clips:[5]

- "A clip of Sarah Palin and her family being murdered in [the] woods with automatic rifles;"

- "Other clips of Sarah Palin interposed among gruesome clips from horror films;"

- "Clips of a group of men called the 'Sisters of Perpetual Indulgence,' who were dressed in nun habits, used garish makeup, showed large pregnant bellies, held bottles of alcohol, and mocked Christians and Catholics in particular;"

- "Clips of a man in a loin cloth aping being [sic] Jesus. . . acting like a 'buffoon,' acting intoxicated and seeking sexual favors from men;"

- "Cartoon clips in which actors portraying Jesus and Santa Claus engage in fighting, with the Jesus character being physically beaten;"

- "Clips of Pope Benedict XVI falling down or acting in a strange manner;"

---

[5] Plaintiff states that Pena, one of the co-owners of Sidetrack, decided which videos the bar would play. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 1.) The evidence Plaintiff cites (Exhibit 34), however, does not support this proposition. Accordingly, the Court disregards Plaintiff's assertion that Pena selected the video clips at issue as unsupported by the evidence. *See, e.g., Cracco,* 559 F.3d at 632; *Cady,* 467 F.3d at 1060.

- "Clips of a Pope Benedict character with bizarre eyes and rotten teeth attacking individuals;"

- "Clips of midgets dressed up as priests chasing young boys seeking sex;" and

- "Clips of gay events with patrons dressed up as religious figures and acting in a drunken manner."

(Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 2.)  Plaintiff recalls that the video clips Sidetrack played generally created the impression that Christians and conservatives were "not welcome" at Sidetrack, but he does not recall specific details about the videos.  (*See* Pl. Dep. at 216-18.) Plaintiff did not complain to anyone at Sidetrack about the videos until May 2011, after DuJan complained to Sidetrack about its employees' harassment of him and Plaintiff.  (*See* Pl. Dep. at 223-24.)

Second, Plaintiff asserts, based on DuJan's testimony, that the master of ceremonies for Sidetrack's special events, Bradley Balof, would incite hate and ridicule directed toward Christians, which he declared to be enemies of the LGBT community.  (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 3; *see also* Ex. 2, DuJan Dep. at 209-11, 221-22.)  Plaintiff vaguely recalls Balof making comments about Christian conservatives being racists during his stand-up comedy routine, but he does recall Balof's specific comments or how often Balof made those comments. (*See* Pl. Dep. at 219-20.)  Plaintiff is "pretty sure" he complained to someone that Balof's routine was offensive to Christians, but he cannot recall when or to whom he made those complaints. (*Id.* at 220-21.)  Plaintiff claims that Johnston also identified Christians as enemies of the LGBT community and encouraged Sidetrack customers to "get in their faces" at special events held at Sidetrack in 2010 and 2011.  (*See* R. 73-3, Pl. Decl. ¶ 11.)  Additionally, Plaintiff saw advertisements on the exterior of Sidetrack mocking Jesus and the resurrection and calling gubernatorial candidate Bill Brady a "religious nut" during the 2010 election campaign.  (*Id.*)

14

Third, Plaintiff claims that his co-workers at Sidetrack, particularly Trudell and Oakes, made threatening comments to Plaintiff because of his religious beliefs and his relationship with DuJan, a Christian conservative blogger. In November 2010, Oakes referred to DuJan as "that Christian conservative" and told Plaintiff that he needed to end his relationship with DuJan if he wanted to continue working at Sidetrack. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 23.) According to Plaintiff, Oakes regularly made these types of comments regarding DuJan and Plaintiff's relationship with him. (*See id.* ¶¶ 23-26.) Plaintiff alleges that Oakes asked Plaintiff if he was a "crazy Christian conservative" like DuJan. (*Id.* ¶ 24.) After Plaintiff answered that he is both a Christian and a Republican, Oakes threatened that if Plaintiff wanted to continue working at Sidetrack, he needed to stop telling people he is Christian and a Republican. (*Id.*) Several other Sidetrack employees also made offensive comments to Plaintiff, degrading Christians as evil and enemies of the gay community, calling Plaintiff a "traitor" because of his Christian beliefs, and insulting Plaintiff's boyfriend and parents because of their religion. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 22-26; R. 73-4, Pl. Resp. to Sidetrack Interrogs. at 14-19; R. 73-5, Pl. Resp. to Oakes' Interrogs. at 4.)

Plaintiff claims that Sidetrack customers who learned of Oakes' bullying then began to mock Plaintiff in high voices. (Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 28.) One customer told Plaintiff "We are watching you!" in a threatening tone. (*Id.*) Another customer made comments to Plaintiff about a doorman at Sidetrack being stabbed, and several other unidentified customers threatened physical harm to Plaintiff. (*Id.*) The Court discusses additional facts below where relevant to Plaintiff's claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, the Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trbatoski v. Ashland Sch. Dist.,* 743 F.3d 524, 528 (7th Cir. 2014). When the moving party has carried its initial burden, however, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, "there is no 'genuine' issue for trial." *Id.*

## ANALYSIS

### I.     Sexual Harassment Claim

"A sexually hostile or abusive work environment is a form of sex discrimination under Title VII of the Civil Rights Act of 1964." *E.E.O.C. v. Management Hospitality of Racine, Inc.,*

666 F.3d 422, 432 (7th Cir. 2012). To survive summary judgment on his sexual harassment claim, Plaintiff must present evidence that would allow a reasonable trier of fact to conclude that "because of his sex, he was subjected to unwelcome sexual conduct that was severe or pervasive enough to create a hostile work environment; in addition, he [must] show that there is a valid basis for employer liability." *Lambert v. Peri Formworks Sys., Inc.,* 723 F.3d 863, 867 (7th Cir. 2013); *see also Durkin v. City of Chicago,* 341 F.3d 606, 611 (7th Cir. 2003) (listing the elements of sexual harassment claims). Sidetrack argues that Plaintiff's sexual harassment claim fails because (1) the alleged conduct was not severe or pervasive enough to create a hostile work environment and (2) Plaintiff has not presented a valid basis for employer liability. (*See* R. 51, Sidetrack Mem. at 16-28.)

A.        **Hostile Work Environment**

Sidetrack argues that most of the alleged acts of sexual harassment, in particular the incidents involving Oakes, Kays, Laster, and Ramirez, are time-barred and the remaining acts involving Stadt are not "severe or pervasive" enough to create a hostile work environment. The Court disagrees.

1.        **Statute of Limitations**

In Illinois, a complainant must file a charge with the EEOC within 300 days of when the allegedly unlawful employment practice occurs. *See* 42 U.S.C. § 2000e-5(e)(1); *Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1121 (7th Cir. 2009) (quoting *Filipovic v. K&R Express Sys., Inc.,* 176 F.3d 390, 395 (7th Cir. 1999)). The complainant's "[f]ailure to do so renders the charge untimely." *Nagle,* 554 F.3d at 1121. Plaintiff filed his EEOC charge on February 24, 2012. (*See* Defs. L.R. 56.1 Stmt. ¶ 50.) Thus, Sidetrack argues, any incident that occurred before April 30, 2011 is time-barred. (*See* Sidetrack Mem. at 17-18.) Sidetrack's argument,

17

however, contradicts Supreme Court and Seventh Circuit precedent regarding the limitations period for hostile work environment claims.

In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court held that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [300-day] time period." 536 U.S. at 122, 122 S. Ct. 2061, 153 L. Ed. 2d 106. Additionally, the Court determined that an "entire hostile work environment encompasses a single unlawful employment practice." *Id.* at 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106; *see also Isaacs v. Hill's Pet Nutrition, Inc.,* 485 F.3d 383, 385 (7th Cir. 2007) ("The Supreme Court treats a hostile work environment as one unlawful employment practice." (citing *Morgan*)). Since *Morgan*, the Seventh Circuit has repeatedly stated that an employee can base a hostile work environment claim on acts that occurred at any time during his or her employment as long as the hostile work environment continued into the 300-day limitations period. *See, e.g., King v. Acosta Sales & Mktg., Inc.,* 678 F.3d 470, 472 (7th Cir. 2012) ("[W]hen an assertedly unlawful employment practice occurs as a pattern over time rather than in one discrete act, it does not matter when the individual deeds contributing to the pattern occurred, if the pattern continued into the 300 days before the charge's filing."); *Turner v. The Saloon, Ltd.,* 595 F.3d 679, 684-85 (7th Cir. 2010) ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."); *Isaacs,* 485 F.3d at 385 ("The employee may complain about any of the constituent acts, no matter how long ago they occurred, as long as the charge is filed within 300 days of any harassing act.").

18

Here, Plaintiff has alleged a hostile work environment claim based on numerous instances in which Sidetrack employees made sexual comments to him, inappropriately touched his buttocks and genitals, and made unwelcome sexual advances toward Plaintiff.  (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 9-19.)  Sidetrack argues that only one of the incidents on which Plaintiff bases his hostile work environment claim—Plaintiff's May 6, 2011 meeting with Stadt in which Stadt placed his hand on Plaintiff's knee and then moved it towards Plaintiff's genitals before Plaintiff stood up and moved to the door—occurred within the 300-day limitations period. (*See id.* ¶ 14.)  One incident, however, is all it takes to bring the entire scope of Plaintiff's hostile work environment allegations within the limitations period.  *See, e.g., Morgan,* 536 U.S. at 122, 122 S. Ct. 2061, 153 L. Ed. 2d 106; *King,* 678 F.3d at 472; *Turner,* 595 F.3d at 684-85; *Issacs,* 485 F.3d at 385.  The Court, therefore, rejects Sidetrack's argument that it should disregard Plaintiff's pre-limitations period harassment allegations.

## 2.    Severe or Pervasive Conduct

Next, the Court must determine whether the alleged harassment was severe or pervasive enough to create a hostile work environment.  *See Turner,* 595 F.3d at 685 (quoting *Lapka v. Chertoff,* 517 F.3d 974, 982 (7th Cir. 2008)).  "To rise to the level of an actionable hostile work environment, the complained-of conduct must have been sufficiently severe or pervasive to have altered the conditions of [the plaintiff's] employment such that it created an abusive working environment."  *See Passananti v. Cook Cnty.,* 689 F.3d 655, 667 (7th Cir. 2012).  In assessing whether a hostile work environment exists, the Court must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonable interferes with an employee's work performance."  *Turner,* 595 F.3d at 685.  Additionally, the

Court must assess the conduct at issue both objectively and subjectively. *See Passananti,* 689 F.3d at 667. "That is, the plaintiff must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment." *Turner,* 595 F.3d at 685.

Plaintiff has presented evidence upon which a reasonable jury could find that the conduct of Sidetrack's employees was sufficiently severe or pervasive to create both a subjectively and objectively hostile work environment. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L.Ed.2d 49 (1986). First, Plaintiff offers sufficient evidence to satisfy the subjective prong of his hostile work environment claim. Plaintiff testified that Stadt's comments and repeated touching of Plaintiff's buttocks and genitals made him feel uncomfortable and interfered with his ability to complete his work. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 9-11, 14.) Plaintiff complained to Kays, Gall, and Brian Brannaghan, a Sidetrack bartender, about Stadt's conduct. (*See* Defs. L.R. 56.1 Stmt. ¶ 66.) Plaintiff also believed Laster and Ramirez began acting negatively toward Plaintiff and over-criticizing him at work because Plaintiff had spurned their sexual advances. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 19.) A reasonable jury could find that this evidence is sufficient to satisfy the subjective prong of Plaintiff's claim. *See Worth v. Tyer,* 276 F.3d 249, 267 (7th Cir. 2001); *Turner,* 595 F.3d at 685.

Second, Plaintiff presents sufficient evidence to show that the harassment he endured was severe or pervasive enough to create an objectively hostile work environment. Drawing the line between what is and is not objectively hostile is often difficult. *See Turner,* 595 F.3d at 686. The Seventh Circuit, however, has repeatedly recognized that touching of "an intimate body part

20

constitutes one of the most severe forms of sexual harassment." *See Worth,* 276 F.3d at 268; *see also Turner,* 595 F.3d at 686. The evidence, viewed in the light most favorable to Plaintiff, shows several incidents in which Sidetrack employees slapped Plaintiff's buttocks, grabbed his genitals, kissed him against his will, and performed oral sex on Plaintiff without his consent. (*See, e.g.,* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 9-19.) These incidents—in addition to Stadt's lewd comments about his "playroom," masturbating to Plaintiff's photograph, and dancing provocatively against Plaintiff while asking "Can't you just pretend I'm not your manager?"— raise a genuine issue of material fact as to whether a reasonable person would find Plaintiff's work environment hostile or abusive. *See, e.g., Turner,* 595 F.3d at 686 (finding that the plaintiff's complaints that his supervisor grabbed his penis through his pockets, pressed her chest against him while making a sexually suggestive comment, and grabbed his buttocks were sufficient to survive summary judgment); *Patton v. Keystone RV Co.,* 455 F.3d 812, 814 (7th Cir. 2006) (reversing summary judgment in favor of the defendant where the evidence showed that the plaintiff's supervisor placed his hand on the plaintiff's "inner thigh, under her shorts, and very near her vagina"); *Worth,* 276 F.3d at 268 ("[A] supervisor touching one's breast near the nipple for several seconds is severe enough to remove such conduct from any safe harbor.").[6]

---

[6] Sidetrack argues that Stadt's conduct toward Plaintiff was not objectively severe enough to create a hostile work environment when considered in context, because, like most nightclubs in the area near Sidetrack, "a certain amount of sexuality is inherent to the venue." (*See* Sidetrack Mem. at 20.) Sidetrack correctly notes that courts must consider the context of workplace conduct in determining whether it constitutes actionable harassment. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). The Court agrees that, in light of the sexually-charged environment Sidetrack fosters, some of the alleged conduct—catcalling and dancing against Plaintiff, for example— alone would not be offensive to a reasonable person working at the bar. The sexually-charged environment, however, does not give Stadt license to rub Plaintiff's genitals or make lewd comments about masturbating to a photograph of Plaintiff's buttocks. Nor does it excuse Kays and Oakes from performing oral sex on Plaintiff against his will.

### B. Basis for Employer Liability

To survive summary judgment, Plaintiff also must establish a valid basis for imposing employer liability on Sidetrack. *See Lambert,* 723 F.3d at 866. Two bases for imposing employer liability exist under Title VII. If a "supervisor" commits the alleged harassment and it culminates in a tangible employment action, the employer is strictly liable for the harassment, subject to any available affirmative defenses. *See Vance v. Ball State Univ.,* --- U.S. ----, 133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764-65, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). If the alleged harasser is the victim's co-worker, on the other hand, the employer is liable only if it was negligent in discovering or remedying the harassment. *See Vance,* 133 S. Ct. at 2439, 186 L. Ed. 2d 565; *see also Lambert,* 723 F.3d at 866.

A "supervisor" for purposes of vicarious liability under Title VII is an individual empowered "to take tangible employment actions against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S. Ct. at 2443, 186 L. Ed. 2d 565 (internal quotation marks omitted). Plaintiff admits that his alleged harassers—Stadt, Kays, Oakes, Laster, and Ramirez—do not qualify as supervisors for purposes of vicarious liability under Title VII. (*See* Defs. L.R. 56.1 Stmt. ¶ 51 ("None of the Sidetrack employees who allegedly harassed Plaintiff had any authority to hire, fire, or otherwise effect [sic] his compensation.").) Plaintiff's only option, therefore, is to establish that Sidetrack was negligent in discovering or remedying the harassment. *See Vance,* 133 S. Ct. at 2439, 186 L. Ed. 2d 565; *see also Lambert,* 723 F.3d at 866.

Plaintiff's negligence theory here turns on whether Sidetrack had notice of his harassment. "Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert,* 723 F.3d at 866-67 (quoting *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1037 (7th Cir. 1998)). If the employer has established procedures for reporting complaints of harassment, "the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack." *Id.* at 867. The focus of the notice inquiry, however, remains on whether the complainant adequately alerted his employer to the harassment, "not whether [the complainant] followed the letter of the reporting procedures set out in the employer's harassment policy." *Cerros v. Steel Techs., Inc.,* 398 F.3d 944, 952-53 (7th Cir. 2005).

Sidetrack's Anti-Harassment Policy sets forth several options an individual may pursue in addressing harassment, including self-help, mediation, submitting a formal complaint for investigation, and seeking reassignment. (*See* Anti-Harassment Policy at 3-5.) The Anti-Harassment Policy designates Defendant Johnston and Sidetrack's attorney, Stephen Herseth, as mediators to assist individuals in handling any issues related to sexual and discriminatory harassment. (*Id.* at 3-4.) The Policy also designates Johnston and Herseth as contacts for submitting a formal complaint. (*Id.*) Plaintiff signed a copy of Sidetrack's Anti-Harassment Policy at the beginning of his employment, acknowledging that he read and understood the Policy. (*Id.*; *see also* Defs. L.R. 56.1(b) Resp. ¶ 29.)

It is undisputed that Plaintiff did not report his allegations of harassment to Johnston or Herseth, as the Anti-Harassment Policy directs. He recalls, however, complaining about some of

the alleged misconduct to other Sidetrack employees. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts

¶¶ 30-31.) Specifically, Plaintiff recalls making the following complaints:

- In August or September of 2010, Plaintiff discussed Stadt's conduct with Brian Branaghan. (*See* Pl. L.R. 56.1 Stmt. of Add'l Facts ¶ 30.)

- In the fall of 2010, after Stadt danced against Plaintiff and asked "Can't you just pretend I'm not your manager," Plaintiff complained about Stadt's conduct to Jason Gall, who was nearby and witnessed the incident. (*See* Pl. Dep. at 269-71.) Plaintiff also reported this incident to Jimmy Kays. (*Id.* at 271-72, 378-79.)

- In the fall of 2010, Plaintiff reported to Kays the incident in which Laster followed Plaintiff to his car, rubbed his body against Plaintiff, and forced a kiss on Plaintiff. (*See* Pl. L.R. 56.1 Stmt. of Add'l Facts ¶ 31.)[7]

Plaintiff argues that these complaints were sufficient to alert Sidetrack of the harassment he was

suffering and to establish a basis to hold Sidetrack liable in negligence. The Court disagrees.

To begin with, although a complainant need not always follow formal complaint

procedures to notify his employer of harassment, he must report the misconduct, "at a minimum,

[to] someone who could 'reasonably be expected to refer the complaint up the ladder to the

employee authorized to act on it.'" *Lambert,* 723 F.3d at 866-67 (quoting *Parkins,* 163 F.3d at

1037). Plaintiff provides no evidence that Brian Branaghan falls into that category of

individuals. Branaghan was a senior bartender who Plaintiff was dating at the time he made

those complaints. (*See* Pl. Dep. at 247-48.) Plaintiff does not contend—let alone present

evidence—that he reasonably expected or even intended his complaints to Branaghan to reach

Sidetrack management.

---

[7] Plaintiff asserts in his statement of additional facts that he also reported Ramirez's conduct to Kays. (*See* Pl. L,R, 56.1(b) Stmt. of Add'l Facts ¶ 31.) In the deposition testimony that Plaintiff cites in support of this assertion, however, Plaintiff testified that he could not remember whether he complained about Ramirez's conduct to Kays. (*See* Pl. Dep. at 410-11.) The Court, therefore, disregards Plaintiff's assertion that he reported Ramirez's conduct to Kays as unsupported by the evidence. *See, e.g., Cracco,* 559 F.3d at 632; *Cady,* 467 F.3d at 1060.

Plaintiff does, however, offer evidence to suggest that he could have reasonably expected Kays and Gall to refer his complaints to those authorized to act on them. Kays, a night manager, was usually the most senior person on duty during the night shifts when Plaintiff worked, and Gall worked as a "bartender manager." (*See* R. 47-9, Kays Dep. at 6-8; Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 30.) Plaintiff testified that he understood from other co-workers that he could direct his work-related complaints to a floor manager or a "bartender/manager," such as Kays or Gall. (*See* Pl. Dep. 33-35.) The Anti-Harassment Policy, moreover, states that, in addition to the formal complaint procedures, an employee "may continue to bring any work-related problem to *his or her supervisor*, Art Johnston or Jose Pena, or our attorney, Stephen Herseth." (Anti-Harassment Policy at 3 (emphasis added).) This provision is ambiguous regarding whether employees other than Johnston and Pena may qualify as individuals to whom Plaintiff could bring his complaints. For purposes of summary judgment, the Court therefore credits Plaintiff's assertions that he believed he could raise complaints with "supervisors" like Kays and Gall. *See Lambert,* 723 F.3d at 868 ("[T]he fact that a company has designated one or two off-site corporate representatives to receive complaints of harassment does not license onsite managers to ignore complaints and evidence of coworker harassment. That is particularly true if . . . there is evidence showing that the company expected its on-site managers to pass this type of complaint up the chain to the human resource manager even if the victimized employee has not (yet) used the policy.").

Even viewing the evidence in the light most favorable to Plaintiff, however, he fails to show that his complaints to Kays and Gall were sufficient to put a reasonable employer on notice of the alleged harassment. *See Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 506-07 (7th Cir. 2004) ("Generally, we do not consider an employer to be apprised of the harassment 'unless

25

the employee makes a concerted effort to inform the employer that a problem exists.'" (quoting *Silk v. City of Chicago,* 194 F.3d 788, 807 (7th Cir. 1999)).  Plaintiff complained of only two incidents to Kays and Gall, neither of which (considered separately or in conjunction) were sufficient to alert them to a probability that Plaintiff was being sexually harassed.  Plaintiff failed to report his more serious allegations of sexual harassment—*i.e.,* that Oakes and Kays had allegedly performed oral sex on him without his consent and that Stadt had grabbed his buttocks and rubbed his genitals, repeatedly suggested that Plaintiff come see his "playroom," and told Plaintiff that he masturbated to photographs of Plaintiff.[8]  *See id.* at 507 (affirming summary judgment where the plaintiff raised only one complaint of harassment with management and "there [was] no evidence that the complaint even remotely pinpointed the myriad of other allegations of discrimination alleged in [the] lawsuit"); *Ford v. Minteq Shapes & Servs., Inc.,* 587 F.3d 845, 848 (7th Cir. 2009) (affirming summary judgment where the plaintiff complained to employer of harassment only once in fourteen months).

Moreover, Plaintiff testified that Kays and Gall brushed off his complaints about Stadt and Laster, stating something to the effect of "that's just Bill" (with respect to Stadt) or "that's just Daniel" (with respect to Laster).  (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 66; *see also* Pl. Dep. at 378-79.)  Given Plaintiff's acknowledgement of the chain of command for making formal harassment complaints and Kays' and Gall's dismissal of Plaintiff's complaints, it was unreasonable for Plaintiff to believe that Kays or Gall would convey his complaints up the ladder to Sidetrack management.  *See Yanick v. Hanna Steel Corp.,* 653 F.3d 532, 550 (7th Cir. 2011) (citing *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 390 (7th Cir. 2010)).  Furthermore,

---

[8] Plaintiff implies that he did not need to report Kays' and Stadt's harassment because Kays and Stadt both had supervisory authority and obviously knew about their own alleged misconduct.  Common sense and Seventh Circuit precedent, however, dictate that "[i]t is unreasonable to expect that [an employee] would transmit complaints about himself to [the company's] management."  *Parkins,* 163 F.3d at 1037.

even if complaining to Kays and Gall initially was reasonable, "any reasonableness quickly evaporated when [Plaintiff's] request for relief went unanswered." *Id.*; *Parkins,* 163 F.3d at 1038 ("A reasonable person, realizing that her complaints were ineffective, would then seek a remedy elsewhere."). Plaintiff testified that after Kays and Gall dismissed his complaint, Plaintiff decided not to pursue his complaints further because he did not want to "cause any waves or issues." (Defs. L.R. 56.1 Stmt. ¶ 66.) Plaintiff's desire to avoid unpleasantness, however, does not excuse his failure to raise his complaints with Sidetrack management. *See Montgomery,* 626 F.3d at 391-92; *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir. 1999) ("While a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms.").

Finally, Plaintiff has not presented evidence that the harassment he suffered was so pervasive and obvious to charge Sidetrack with constructive knowledge of the harassment. *See Rhodes,* 359 F.3d at 506-07 (the plaintiff failed to set forth sufficient evidence to charge her employer with constructive knowledge of harassment where the plaintiff made only a single complaint about a pornographic picture in her locker, the plaintiff presented no evidence that anyone else complained about the pornographic materials, and other employees kept a "lookout" to alert them if someone approached while they watched pornographic videos at work). Plaintiff admits that most of the incidents occurred outside of work or in areas of the bar where others could not observe it, and the acts that others could observe—*i.e.,* catcalling, dancing against Plaintiff, etc.—were not so severe or pervasive to provide constructive notice to Sidetrack of the harassment. In sum, the evidence, even viewed in the light most favorable to Plaintiff, would not allow a trier of fact to find that Sidetrack was negligent in discovering or remedying the sexual

harassment Plaintiff suffered. The Court, therefore, grants summary judgment to Sidetrack on Plaintiff's sexual harassment claim.

## II.     Religious Harassment Claim

Plaintiff asserts that Sidetrack and its employees created a hostile work environment by playing anti-Christian videos at the bar, making negative remarks about Christians during special events, and degrading Plaintiff and others for their religious beliefs. (*See* Pl. Resp. Br. at 15.) The standards governing Plaintiff's religious harassment claim parallel those for sexual harassment. To survive summary judgment, Plaintiff must point to evidence showing that because of his religion, he suffered severe or pervasive conduct that created a subjectively and objectively hostile work environment and that a basis for employer liability exists. *See Lambert,* 723 F.3d at 868 (sexual and racial harassment); *see also Aronson v. Health Care Excel, Inc.,* No. 1:05-cv-1181-DFH-WTL, 2007 WL 3091579, at *5 (S.D. Ind. Oct. 19, 2007) (Hamilton, J.) (citing *Rhodes,* 359 F.3d at 505). Sidetrack argues that Plaintiff's religious harassment claim fails for three reasons: (1) the alleged harassment did not occur "because of" Plaintiff's religion; (2) it was not sufficiently severe or pervasive to create an objectively hostile workplace; and (3) Plaintiff failed to establish a valid basis for employer liability. The Court addresses each argument below.

### A.     Religious Character or Purpose

For harassment to be actionable under Title VII, it must have occurred "because of" an employee's protected status—in this case, his religion. *See* 42 U.S.C. § 2000e-2(a)(1); *Cook v. Cub Foods, Inc.,* 99 F. Supp. 2d 945, 948 (N.D. Ill. 2000) (citing *Oncale,* 523 U.S. at 81, 118 S. Ct. 998, 140 L. Ed. 2d 201)). Harassment occurs "because of" an employee's religion if it has a religious "character or purpose." *See Vance v. Ball State Univ.,* 646 F.3d 461, 470 (7th Cir.

2011), *aff'd* --- U.S. ----, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013).  Sidetrack argues that

Plaintiff cannot establish this element of his claim because the harassment at issue focused on

political issues, rather than Plaintiff's religious beliefs.  (*See* Sidetrack Mem. at 31-32.)

Viewing the evidence in the light most favorable to the Plaintiff and drawing all

reasonable inferences in his favor, as the Court must at the summary judgment stage, a genuine

issue exists regarding whether the harassment Plaintiff suffered had a religious character or

purpose.  On one hand, many of the statements at issue appear to have had a political animus,

rather than a religious one.  Oakes and Trudell, for example, largely directed their attacks against

"Christian conservatives," rather than simply Christians.  Christian conservatives are well-known

for their support of socially conservative policies, including their opposition to same-sex

marriage, and Sidetrack and its owners have been at the forefront of Chicago's LGBT civil rights

movement for 35 years.  In this context, therefore, Oakes' and Trudell's derogatory comments

about Christian conservatives likely concerned Plaintiff's and DuJan's political ideology rather

than their religious beliefs.

On the other hand, though, some of the derogatory comments at issue, viewed in the light

most favorable to Plaintiff, suggest that the attacks had both a political *and* religious character or

purpose.  Plaintiff claims, for example, that Sidetrack employees called him a "traitor" for being

Christian because "Christians hate gays," (*see* Pl. Resp. to Sidetrack Interrogs. at 14-19; *see also*

Pl. Dep. at 49-51); told him that Christians, including his parents, were "awful people," (*see* Pl.

Resp. to Sidetrack Interrogs. at 15, 18-19); stated that Christians are "evil," (*see id.* at 19);

threatened that if he wanted to keep working at Sidetrack, he needed to stop telling people he is

"a Christian or a conservative or a Republican, or any of that, because you can't work [at

Sidetrack] and be that." (Pl. Resp. to Oakes' Interrogs. at 4); harassed him about going to church

(*see* Pl. Dep. at 213-14); told him that maybe he would not drop glasses at the bar if he prayed hard enough (*see id.*); and referred to Christians as crazy (*see* Pl. Resp. to Oakes' Interrogs. at 4). Additionally, Plaintiff claims when he told Pena that he is a Christian and goes to "non-gay churches," Pena responded "Oh Joe, oh Joe," shaking his head in a disapproving manner.  (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 1.)

The line between religious and political beliefs—and, thus, the line between protected and non-protected characteristics under Title VII—is often muddy, especially in the context of social policy issues, and the Court's role at the summary judgment stage is not to evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter.  *See Guzman v. Sheahan,* 495 F.3d 852, 857 (7th Cir. 2007).  Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court cannot conclude as a matter of law that the harassment Plaintiff suffered occurred solely because of his political, rather than religious, beliefs.  *Cf. Passananti v. Cook Cnty.,* 689 F.3d 655, 667-68 (7th Cir. 2012) (finding that enough evidence existed to allow the jury to determine whether a co-worker who called the plaintiff a "bitch" was attacking her because of her sex).

### B.     Objectively Hostile Work Environment

To prevail on his religious harassment claim, Plaintiff also must present evidence that the alleged harassment was sufficiently severe or pervasive to create an objectively hostile work environment.  *See Turner,* 595 F.3d at 685.  In determining whether a workplace is objectively hostile, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*  The Court, moreover, must consider the "social context in which [the]

particular behavior occurs and is experienced by its target." *See Oncale,* 523 U.S. at 81, 118 S. Ct. 998, 140 L. Ed. 2d 201.

Here, Plaintiff points to numerous instances in which Sidetrack employees made comments to Plaintiff degrading Christians as evil, awful people, or enemies of the gay community; called Plaintiff a "traitor" because of his Christian beliefs; told him to "pick a side;" and insulted Plaintiff's boyfriend and parents for their Christian beliefs. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶¶ 22-26; Pl. Resp. to Sidetrack Interrogs. at 14-19; Pl. Resp. to Oakes' Interrogs. at 4.) Plaintiff also has offered evidence that Sidetrack employees repeatedly harassed Plaintiff for dating DuJan because of DuJan's religious beliefs, in part, and even threatened to have Plaintiff fired unless he ended his relationship with DuJan. Even though courts consider the impact of such "secondhand harassment" to be less severe, *see Peters v. Renaissance Hotel Operating, Co.,* 307 F.3d 535, 552 (7th Cir. 2002); *Ellis v. CCA of Ten. LLC,* 650 F.3d 640, 647 n.2 (7th Cir. 2011) ("In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment."), it is still relevant to determining whether, as a whole, the evidence establishes a hostile work environment. Furthermore, Plaintiff offers evidence that once Sidetrack employees learned that he shared DuJan's religious beliefs, they directed their insults at Plaintiff too.

These incidents of harassment may not be sufficiently severe to create a hostile work environment when viewed separately, but the Court must view the pattern of harassment as a whole. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court finds that a genuine issue exists regarding whether the harassment Plaintiff suffered was pervasive enough to establish an objectively hostile work environment. *See Cerros,* 288 F.3d at 1047 (noting that severity and pervasiveness measures

"are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, . . . while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute"); *Hall v. City of Chicago,* 713 F.3d 325, 332 (7th Cir. 2013) ("[I]ncidents, which viewed in isolation seem relatively minor, that consistently or systematically burden [a protected class] throughout their employment are sufficiently pervasive to make out a hostile work environment claim.").

In making this determination, the Court notes that the allegedly offensive anti-Christian video clips about which Plaintiff has complained do not contribute to the alleged hostility of his work environment.  Sidetrack played the video clips during "Comedy Nights," and it obtained all or at least a vast majority of the clips from mainstream broadcasts.  None of the allegedly offensive material was directed at Plaintiff.  Sidetrack, moreover, is known for playing comedic and other video clips on screens around the bar.  The Court must evaluate the "totality of the circumstances" in determining whether Plaintiff's work environment was objectively hostile, but it need not—and must not—abandon common sense and sensitivity to social context in evaluating the alleged hostility.  Just as a reasonable professional football player would not consider his working environment to be severely or pervasively hostile "if the coach smacks him on the buttocks as he heads onto the field," *see Oncale,* 523 U.S. at 81, 118 S. Ct. 998, 140 L. Ed. 2d 201, a reasonable person in Plaintiff's position would not view mainstream video clips played as part of Sidetrack's Comedy Night events to create or even contribute to an allegedly hostile work environment.  The Court, therefore, limits the remainder of its discussion of the complained-of conduct to the comments made by Sidetrack employees, owners, and customers.

### C.    Basis for Employer Liability

Plaintiff must present evidence to establish a valid basis for employer liability to survive summary judgment on his religious harassment claim.  *See Lambert,* 723 F.3d at 866.  That is, Plaintiff must offer evidence that would subject Sidetrack to employer liability under either a strict liability theory for harassment by a supervisor or a negligence theory for harassment by co-workers.  *See Vance,* 133 S. Ct. at 2439, 186 L. Ed. 2d 565; *see also Lambert,* 723 F.3d at 866. Plaintiff argues that Sidetrack is strictly liable for Plaintiff's harassment because Pena, a co-owner of Sidetrack, selected the allegedly offensive videos that Sidetrack played.  (*See* Pl. Resp. Br. at 21-23.)  As explained above, however, the Court has rejected Plaintiff's argument that the video clips added to the hostility of his work environment and has disregarded Plaintiff's allegation that Pena selected the video content as unsupported by the evidence.  Plaintiff's argument for holding Sidetrack strictly liable for the alleged harassment therefore fails.

Viewing the evidence in the light most favorable to Plaintiff, however, a reasonable jury could determine that, based on the number of Sidetrack employees who purportedly harassed Plaintiff and the pervasiveness of that harassment, Sidetrack had constructive notice of the harassment and may be liable under a negligence theory.  *See Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 478 (7th Cir. 2004) ("[A]n employer could be charged with constructive notice where the harassment was sufficiently obvious."); *Wilson v. Chrysler Corp.,* 172 F.3d 500, 509 (7th Cir. 1999) ("[N]otice may be presumed where the work environment is permeated with pervasive harassment.").  Here, Plaintiff offers evidence that over a dozen Sidetrack employees and, in one instance, one of Sidetrack's owners, made derogatory comments about Christians to Plaintiff over the course of his ten month employment.  According to Plaintiff, the harassment by Sidetrack employees, particularly Oakes, even caused Sidetrack patrons to begin

making derogatory comments to Plaintiff and DuJan about their religious beliefs. (*See* Pl. Resp. to Oakes Interrogs. at 3.) Plaintiff, moreover, claims that he repeatedly complained of the harassment to Kays in the spring of 2011, and Kays eventually told Plaintiff that he could not come to him with complaints about the alleged bullying. (*See* Pl. L.R. 56.1(b) Stmt. of Add'l Facts ¶ 32.) Under these circumstances, the Court finds that a genuine issue of material fact exists regarding whether Sidetrack had constructive notice of the harassment. *See Vance,* 133 S. Ct. at 2439, 186 L. Ed. 2d 565; *see also Lambert,* 723 F.3d at 866.

Assuming that Sidetrack was on notice, the Court must next determine whether Sidetrack took adequate steps to investigate and remedy the harassment. *See Wilson,* 172 F.3d at 510. Although the alleged harassment began in the fall of 2010 and persisted into 2011, there is no evidence in the record that Sidetrack took any action to remedy the harassment until after it received DuJan's letter on May 18, 2011. Viewing the evidence in the light most favorable to the Plaintiff and drawing all reasonable inferences in his favor, a genuine issue exists regarding whether Sidetrack, therefore, may be liable in negligence. Accordingly, the Court denies Sidetrack's motion for summary judgment with respect to Plaintiff's religious harassment claim.

## III.    Retaliation Claim

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See* 42 U.S.C. § 2000e-3(a). Here, Plaintiff alleges that Sidetrack retaliated against him for complaining about the sexual and religious harassment he suffered at the hands of Sidetrack employees.

To avoid summary judgment on a Title VII retaliation claim using the direct method of proof, as Plaintiff seeks to do here, Plaintiff must show that "(1) [he] engaged in statutorily protected activity; (2) [he suffered] an adverse employment action taken by the employer; and (3) there was a causal connection between the two." *See Northington v. H & M Int'l,* 712 F.3d 1062, 1065 (7th Cir. 2013). Sidetrack does not dispute that Plaintiff has met the first two elements. Only the third element regarding causation is at issue.

With respect to the causal element, Plaintiff must prove that his protected activity was a but-for cause of the adverse employment actions. *See University of Tex. Sw. Med. Ctr. v. Nassar,* --- U.S. ---, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). That is, he must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*; *see also Hobgood v. Illinois Gaming Bd.,* 731 F.3d 635, 643 (7th Cir. 2013). A plaintiff may prove but-for causation through direct evidence, "which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')" or, more commonly, through circumstantial evidence presenting a "convincing mosaic" that would permit the same inference without the employer's admission. *See Coleman v. Donahoe,* 667 F.3d 835, 860 (7th Cir. 2012) (citations omitted); *see also Hobgood,* 731 F.3d at 643-45. Evidence commonly used to establish a "convincing mosaic" includes "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood,* 731 F.3d at 643-44. The Court must consider the individual "bits and pieces" of evidence Plaintiff offers in support of his evidentiary mosaic in context and

as a whole.  *See Hobgood,* 731 F.3d at 644.  Because both parties' briefs focus almost exclusively on whether Plaintiff has presented evidence of pretext, the Court will address this issue first.

###    A.    Pretext

The pretext inquiry focuses on the honesty of the employer's explanation for the adverse employment action, not the validity or reasonableness of that explanation.  *See Hnin v. TOA (USA), LLC,* --- F.3d ----, 2014 WL 1758457, at *5 (7th Cir. May 5, 2014).  A plaintiff can show pretext by establishing that the defendant's proffered reason for the adverse action "(1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action."  *Bates v. City of Chi.,* 726 F.3d 951, 956 (7th Cir. 2013); *see also Hobgood,* 731 F.3d at 646 (determining that if an employer's reason for a termination "is without factual basis or is completely unreasonable, [it provides] evidence that an employer might be lying about its true motivation").

On August 26, 2011, Johnston sent Plaintiff a termination letter informing Plaintiff that Sidetrack was terminating him based on the results of its investigation into Plaintiff's complaints and Plaintiff's refusal to cooperate with the investigation.  (R. 49-9, Termination Ltr.)  According to the letter, Sidetrack's investigation revealed statements from other Sidetrack employees, documents, and time records that contradicted Plaintiff's allegations of harassment.  (*Id.*)  Johnston noted in the letter that Plaintiff had failed to provide information that Sidetrack had repeatedly requested during the investigation and had failed to cooperate with Sidetrack in setting up a meeting with Plaintiff to discuss the results of the investigation.  (*Id.*)  Johnston further noted that Plaintiff had provided a "flippant" response to Sidetrack's requests for a meeting.  (*Id.*)

Sidetrack offers evidence showing that its attorney attempted to contact Plaintiff's attorney numerous times in July and August 2011 to obtain emails and text messages that Plaintiff alleged supported his complaints and to set up a meeting to discuss the results of Sidetrack's investigation. (*See* R. 48-9.) Plaintiff's attorney, however, never responded. Eventually, Bryan Portman, Sidetrack's accountant, attempted to schedule a meeting with Plaintiff directly (after Plaintiff first contacted Portman about a discrepancy with the calculation of his pay while on leave). Portman noted in his email that Sidetrack's counsel had requested electronic materials from Plaintiff's counsel, but had received no response. He also advised Plaintiff that Sidetrack would have its attorney at the meeting, and Plaintiff may want to have his attorney attend as well. Plaintiff responded that he would check on his attorney's availability and would let Portman know if he and his attorney were available to meet on August 24, 2011. (R. 49-7.) Plaintiff, however, never followed up with Portman, and he did not respond to Portman's additional emails asking about the status of the August 24, 2011 meeting. (*See* R. 49-4, 49-5.)

Portman again emailed Plaintiff on August 25, 2011 stating that due to the lack of response from Plaintiff and his attorney, Sidetrack would conclude its investigation based on the facts known to it. (*See* R. 49-6.) Plaintiff responded to Portman the same day, stating, in relevant part:

> I have a copy of an email sent from Art Johnston, President of Sidetrack, advising you that I am represented by counsel in Mr. Stephen Boulton of McCarthy & Duffy. Therefore, it's inappropriate of you to harass me in multiple emails to meet with you on your arbitrary timeline. . . . You clearly have Mr. Boulton's contact information, as well as both an operational computer and a working telephone. You need to arrange with Mr. Boulton a means of resolving the discrepancy in what you have paid me and what I should have been paid while on this ongoing period of paid leave.

37

(*See* R. 49-8.)  Sidetrack terminated Plaintiff the next day, citing Plaintiff's false statements in his complaints, his refusal to cooperate in Sidetrack's investigation, and his "flippant" August 25, 2011 email as reasons for Plaintiff's termination.  (*See* Termination Ltr.)

Plaintiff contends that Sidetrack's investigation into his complaints was a "sham" and its professed reasons for terminating him were mere pretext because Sidetrack always intended to fire Plaintiff after he complained about the harassment he suffered.  Plaintiff, however, offers no evidence (only unsupported speculation) to support his pretext argument.  First, Plaintiff's contention that Defendants have shifted positions during this litigation about the reasons for Plaintiff's termination (*see* Pl. Resp. Br. at 25-27) is without merit.  Johnston's termination letter provided several reasons for Plaintiff's termination, and although Johnston and Sidetrack's counsel have relied on or emphasized some reasons over others at various points in this litigation, they have not raised *new* after-the-fact justifications for Plaintiff's termination.  *See Schmidt v. R. Lavin & Sons, Inc.,* No. 00 C 0804, 2001 WL 290362, at *8 (N.D. Ill. Mar. 22, 2001) (rejecting the plaintiff's pretext argument, which the plaintiff based on selective citations to deposition testimony in an attempt to distort the facts).

Second, Plaintiff contends that his failure to meet with Sidetrack was not a refusal to cooperate with Sidetrack's investigation because Sidetrack never ordered him to attend the August 24, 2011 meeting and it had given him an unreasonably short amount of time to schedule the meeting.  (*See* Pl. Resp. Br. at 27-29.)  Plaintiff's argument is unavailing, though, because his failure to attend the August 24, 2011 meeting is not the only evidence of his lack of cooperation with Sidetrack's investigation.  Sidetrack repeatedly attempted to meet with and obtain information from Plaintiff's attorney to no avail.  After more than a month passed without a response from Plaintiff's attorney, Portman attempted to schedule a meeting directly with

Plaintiff.  Although Plaintiff initially responded that he would look into his attorney's availability for the meeting, Plaintiff repeatedly failed to respond to follow-up inquiries from Portman about the meeting.  Eventually, Sidetrack informed Plaintiff that, due to Plaintiff's lack of cooperation, it would conclude its investigation based on the facts known to it.  Only then did Plaintiff respond to Portman, accusing Portman of sending harassing emails and sarcastically stating that because Portman obviously had an operating computer and a working telephone, he should direct his inquiries to Plaintiff's attorney—the same attorney who had not responded to inquiries from Sidetrack's counsel for over a month.  This evidence, taken as a whole and even viewed in the light most favorable to Plaintiff, shows that it was not merely Plaintiff's failure to meet with Sidetrack on August 24, 2011, but, rather, his overall pattern of non-cooperation, culminating in his dismissive August 25, 2011 email to Portman, that led to his termination.

Plaintiff also points out that that he regularly communicated with Sidetrack during its investigation.  Plaintiff notes that he wrote a personal statement outlining his allegations of harassment in May 2011 and met with Sidetrack's investigator to discuss those allegations in June 2011.  In addition, he regularly communicated with Sidetrack during his leave about returning to work and the calculation of his wages and tips.  Plaintiff's initial cooperation in the investigation and his emails about matters unrelated to the investigation, however, do not undermine Sidetrack's contention that it terminated Plaintiff for failing to cooperate with Sidetrack's investigation in August 2011.

Third, Plaintiff's argument that he can prove pretext because Defendants' witnesses are not credible fails.  In support of this argument, Plaintiff cites to (1) purported inconsistencies in Johnston's testimony regarding the reasons he placed Plaintiff on leave, (2) evidence that Sidetrack had not placed two previous employees who had made sexual harassment complaints

on leave pending an investigation into their complaints, (3) discrepancies between Johnston's and Portman's explanation of the purpose of the August 24, 2011 meeting, and (4) Sidetrack's claim of privilege over Brett Rappaport's investigation report even though Rappaport told Plaintiff he was acting merely as a factual investigator and would provide Plaintiff with a copy of his report. None of these arguments is availing.

To begin with, Johnston's testimony is not internally inconsistent as Plaintiff claims. Rather, it shows that Johnston considered several factors in deciding whether to place Plaintiff on leave, and ultimately decided to place Plaintiff on leave during the investigation into Plaintiff's complaints because of Plaintiff's expressed discomfort at work. (*See* R. 47-3, Johnston Dep. at 62-74.) Johnston also testified that Sidetrack did not place the two previous employees who had complained about sexual harassment on leave because the facts surrounding those incidents were not in dispute, and, therefore, Sidetrack did not need to conduct investigations in those instances. (*Id.* at 72-73.) Plaintiff offers no evidence to refute this testimony.

Additionally, although Portman testified that one of the purposes of the August 24, 2011 meeting was to investigate the allegations in DuJan's discrimination complaint and Johnston testified that this was not a purpose of the August 24, 2011 meeting, this discrepancy alone does not raise doubt as to the sincerity of Sidetrack's reasons for terminating Plaintiff. Nor is this discrepancy sufficient to call into question Johnston's or Portman's overall veracity. *See Ahuja v. Danzig,* 14 Fed App'x 653, 658 (7th Cir. 2001) ("We agree that a jury can conclude that an employer's proffered reasons are pretextual if the employer's testimony contains such inconsistencies as to call into question the employer's overall veracity, . . . but here none of the

claimed inconsistencies raise doubt as to the sincerity of Stiles's claim that Rettinger was better suited to the job.").

Finally, if Plaintiff believed that Sidetrack had improperly asserted attorney-client privilege over Rappaport's investigation report, he could have—and should have—moved to compel Sidetrack to produce the report. Plaintiff, however, failed to do so. In sum, Plaintiff fails to present evidence that would allow a reasonable jury to find that Sidetrack's professed reasons for terminating Plaintiff were mere pretext.

### B. Suspicious Timing

Plaintiff argues that the "suspicious timing" of his termination creates an inference of a causal connection between his complaints of harassment and his termination. Evidence of suspicious timing coupled with other evidence of retaliatory motive "can sometimes raise an inference of a causal connection . . . ." *See Smith v. Bray,* 681 F.3d 888, 908 (7th Cir. 2012). Suspicious-timing evidence, however, is rarely sufficient in and of itself to create a triable issue. *See, e.g., Harper v. C.R. England, Inc.,* 687 F.3d 297, 308 (7th Cir. 2012); *Kidwell v. Eisenhauer,* 679 F.3d 957, 966 (7th Cir. 2012); *Smith,* 681 F.3d at 907.

Plaintiff submitted a personal account describing the harassment he had suffered to Sidetrack's investigator on May 23, 2011. Sidetrack placed him on paid leave from May 23, 2011 until it terminated him four months later on August 26, 2011. Plaintiff argues that despite the four-month delay between his complaints and his termination, the timing of his termination is still suspicious because it occurred two days after Sidetrack responded to the discrimination charge DuJan filed against Sidetrack with the City of Chicago. Plaintiff theorizes that Sidetrack intended to fire Plaintiff shortly after receiving his personal account, but decided to keep Plaintiff

on payroll until it responded to DuJan's charge in the hopes that doing so would make Plaintiff more willing to cooperate in Sidetrack's defense against DuJan's allegations.

Sidetrack offers a competing explanation for the timing of Plaintiff's termination—*i.e.,* that Sidetrack fired Plaintiff two days after he failed to meet with Sidetrack's investigator and one day after Plaintiff's insubordinate email to Portman. At the summary judgment stage, however, the Court must draw all reasonable inferences in Plaintiff's favor. *See Hobgood,* 731 F.3d at 644. The Court, therefore, credits Plaintiff's argument that the suspicious timing of his termination provides some evidence of causation. Without additional evidence to support an inference of retaliation, however, this evidence alone is insufficient to create a triable issue. *See, e.g., Harper,* 687 F.3d at 308; *Kidwell,* 679 F.3d at 966; *Smith,* 681 F.3d at 907.[9]

### C. Investigation into Plaintiff's Complaints

Finally, Plaintiff argues that Sidetrack cannot avoid liability under Title VII by firing him simply because it disbelieved his complaints. (*See* Pl. Resp. Br. at 35-37.) Plaintiff relies on the Eighth Circuit's opinion in *Gilooly v. Missouri Department of Health and Senior Services,* 421 F.3d 734 (8th Cir. 2005), in support of this argument. In *Gilooly,* the Eighth Circuit reasoned:

> It cannot be the case that any employer who files a Title VII claim and is disbelieved by his or her employer can be legitimately fired. If such were the case, every employee could be deterred from filing their action and the purposes of Title VII in regards to sexual harassment would be defeated. However, it also

---

[9] In support of his retaliation argument, Plaintiff submits two emails purportedly from Sidetrack customers inquiring into Plaintiff's employment status with Sidetrack. (*See* R. 73-7 at 000025-26.) According to the emails, Sidetrack employees told the customers in July 2011 that Sidetrack had fired Plaintiff "a few months ago." (*Id.*) Plaintiff argues that these emails corroborate his theory that Sidetrack decided to fire Plaintiff in May 2011 and simply kept him on payroll until August 2011 to convince him to assist Sidetrack in defending against DuJan's allegations. The emails, however, are hearsay, *see* Fed. R. Civ. P. 801-02, and Plaintiff fails to establish that an exception to the rule against hearsay applies. It is well-established that "[a] party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) (collecting cases). The Court, therefore, did not consider these emails in deciding Sidetrack's summary judgment motion.

> cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about [unlawful] harassment. To do so would leave employers with no ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact.

*Id.* at 740, *cited in Hatmaker v. Memorial Med. Ctr.,* 619 F.3d 741, 745 (7th Cir. 2010).

The employer in *Gilooly* believed the plaintiff had lied in its investigation based "solely on the statements of other employees and witnesses," but had no independently verifiable evidence that contradicted the plaintiff's allegations. *See Gilooly,* 421 F.3d at 740. The Eighth Circuit found that "[w]ithout such additional corroboration, the statements in the termination letter amount to little more than a description of conflicting stories with the employer disbelieving [the plaintiff's] version of the events." *Id.* The court determined that allowing an investigation to "essentially short-circuit" a trial on the plaintiff's retaliation claim in this way would undermine the purpose of Title VII and remove the assessment of witness credibility from the province of the jury. *Id.* at 740-41. Accordingly, the Eighth Circuit held that the district court had erred in granting summary judgment to the employer. *Id.*

Plaintiff, relying on *Gilooly,* argues that Sidetrack cannot legitimately fire him based solely on its determination that other Sidetrack employees' accounts of the events are more credible than Plaintiff's account. *Gilooly*, however, is distinguishable from this case. Here, Sidetrack terminated Plaintiff not just because of the questionable veracity of his allegations, but also because Plaintiff refused to cooperate in Sidetrack's investigation into those allegations. Plaintiff and his attorney failed to provide emails and text messages that purportedly supported Plaintiff's allegations, and they disregarded numerous attempts by Sidetrack to meet with them to discuss their questions regarding Plaintiff's allegations. The concern at issue in *Gilooly*—that the termination of the plaintiff based solely on the investigator's disbelief of her allegations

43

would undermine the purpose of Title VII—simply is not present here where Sidetrack terminated Plaintiff for his lack of cooperation in investigating the veracity of his allegations.[10]

In sum, the only evidence Plaintiff offers to create a "convincing mosaic" of retaliatory evidence is the suspicious timing between the deadline for Sidetrack to respond to DuJan's charge and Plaintiff's termination two days after that deadline. As explained above, this evidence of suspicious timing alone is insufficient to allow Plaintiff's claim to survive summary judgment. *See Coleman,* 667 F.3d at 860-61; *Smith,* 681 F.3d at 907. The Court, therefore, grants summary judgment for Sidetrack on Plaintiff's retaliation claim.

## IV. Intentional Infliction of Emotional Distress

In Count IV of the Complaint, Plaintiff asserts an IIED claim against the Individual Defendants and Sidetrack. Defendants argue that the Illinois Human Rights Act ("IHRA") preempts Plaintiff's IIED claim and that Plaintiff, moreover, has failed to establish *prima facie* IIED claims against the Individual Defendants.

### A. Preemption

Section 8-111(D) of the IHRA provides, in relevant part, that "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation," which includes unlawful discrimination and sexual harassment, "other than as set forth in this Act." 775 ILCS 5/8-111(D) (West 2014) (formerly 775 ILCS 5/8-111(C)). The Illinois Supreme Court has addressed preemption under Section 8-111(D) of the IHRA on three occasions. In *Geise v. Phoenix,* 159

---

[10] Plaintiff also argues that Sidetrack waived its ability to raise a "good faith" investigation defense because they failed to plead it as an affirmative defense. (*See* Pl. Resp. Br. at 32-34.) Plaintiff misunderstands Sidetrack's argument. Sidetrack has not asserted a "good faith" defense; it simply argues that its professed reasons for terminating Plaintiff were not pretext because, whether right or wrong, Sidetrack honestly believed those reasons. Plaintiff—not Sidetrack—has the burden of proof on this issue, and Sidetrack relies on evidence regarding its investigation to controvert Plaintiff's argument. Accordingly, Sidetrack's honest belief argument is not an affirmative defense that it needed to plead in its Answer under Federal Rule of Civil Procedure 8(c). *See Winforge, Inc. v. Coachmen Indus., Inc.,* 691 F.3d 856, 872 (7th Cir. 2012).

Ill. 2d 507, 203 Ill. Dec. 454, 639 N.E.2d 1273 (Ill. 1994), the Illinois Supreme Court considered

whether the IHRA preempted the plaintiff's common law tort claims against her former

employer for negligent hiring and negligent retention of the employee who sexually harassed her.

The Illinois Supreme Court found that the concept of sexual harassment was "inextricably

linked" to the plaintiff's claims because "[a]bsent the allegations of sexual harassment, [the

plaintiff] would have no independent basis for imposing liability on her former employer . . . ."

*Id.* at 516-17.  It therefore held that the IHRA preempted the plaintiff's claims for negligent

hiring and negligent retention.  *Id.* at 518.

     In *Maksimovic v. Tsogalis,* 177 Ill. 2d 511, 227 Ill. Dec. 98, 687 N.E.2d 21 (Ill. 1997), the

Illinois Supreme Court "clarified" its holding in *Geise*, stating:

> The rule from *Geise* is not that the [IHRA] precludes the circuit court from
> exercising jurisdiction over *all* tort claims related to sexual harassment.  Rather,
> whether the circuit court may exercise jurisdiction over a tort claim depends upon
> whether the tort claim is inextricably linked to a civil rights violation such that
> there is no independent basis for the action apart from the [IHRA] itself.

*Id.* at 517 (emphasis in original).  *Maksimovic* explained that the IHRA does not preempt "tort

claims which, though related to sexual harassment, have an independent basis in the common

law."  *Id.* at 514.  If a plaintiff can satisfy the elements of a tort without reference to legal duties

that the IHRA creates, the tort claim is not "inextricably linked" to a civil rights violation, and

courts may exercise jurisdiction over it.  *Id.* at 517.  In *Maksimovic*, for example, the Illinois

Supreme Court held that the IHRA did not preempt the plaintiff's claims of assault, battery, and

false imprisonment, which "are long-recognized tort actions [that] exist wholly separate and

apart from a cause of action for sexual harassment under the [IHRA]."  *Id.*

     The Illinois Supreme Court most recently considered IHRA preemption in *Blount v.

Stroud,* 232 Ill. 2d 302, 328 Ill. Dec. 239, 904 N.E.2d 1 (Ill. 2009).  In *Blount*, the plaintiff

asserted a common law claim for retaliatory discharge based on her allegation that her former

employer fired her for refusing to commit perjury. The Illinois Supreme Court reiterated that the IHRA does not preempt all common law torts factually related to incidents of civil rights violations, only those claims that are "inextricably linked" to civil rights violations. *Id.* at 315. With respect to the plaintiff's allegations, the Illinois Supreme Court found that although a court could construe the plaintiff's claim as alleging retaliation for opposing unlawful discrimination—which violates the IHRA—the plaintiff "need not and [did] not rely upon the public policy embodied in the [IHRA] to satisfy the elements of her common law tort claim." *Id.* Because the plaintiff had "established a basis for imposing liability on defendants independent of the [IHRA]," the IHRA did not preempt her retaliatory discharge claim. *Id.*

Under these standards, the proper inquiry here is not on whether the facts that support Plaintiff's IIED claim could also have supported a harassment or retaliation claim, but on whether Plaintiff can prove the elements of his IIED claim independent of the legal duties that the IHRA creates. *See Naeem v. McKesson Drug Co.,* 444 F.3d 593, 604 (7th Cir. 2006). In *Naeem,* for example, the plaintiff alleged an IIED claim based on the defendants' pattern of behavior that "created impossible deadlines, set up obstacles to her performing her job, and sabotaged her work." *Id.* at 605. The Seventh Circuit determined that the IHRA did not preempt her IIED claim because it "rest[ed] not just on behavior that is sexually harassing, but rather behavior that would be a tort no matter what the motives of the defendant." *Id.* Where, however, the plaintiff's allegations of unlawful harassment, discrimination, and retaliation are more than "merely incidental" to his IIED claim but, in fact, form the "core of [the plaintiff's] theory," IHRA preemption applies. *See Smith v. Chicago Sch. Reform Bd. of Trustees,* 165 F.3d 1142, 1151 (7th Cir. 1999) (finding that preemption applied where the plaintiff "had pitched her

46

entire case on the theory that she [was] a victim of racial harassment and retaliation" (emphasis omitted)); *see also Geise,* 159 Ill. 2d at 517, 203 Ill. Dec. 454, 639 N.E.2d 1273.

As numerous courts in this District have found, an employer's duty not to commit IIED is independent of its duty under the IHRA to keep the workplace free of unlawful discrimination and harassment. *See Zuidema v. Raymond Christopher, Inc.,* 866 F. Supp. 2d 933, 940 (N.D. Ill. 2011) ("Although the IHRA creates a duty to keep a workplace free of sexual harassment, the duty not to commit the intentional tort of intentional infliction of emotion distress exists on its own."); *see also Weis v. Timberline Knolls, LLC,* No. 10 C 5935, 2011 WL 687137, at *5 (N.D. Ill. Feb. 17, 2011) ("Even if the IHRA did not prohibit pregnancy discrimination, defendants' course of conduct would be actionable if plaintiff can prove all of the elements of IIED."); *Arnold v. Janssen Pharmaceutica, Inc.,* 215 F. Supp. 2d 951, 955 (N.D. Ill. 2002) ("That extreme and offensive conduct might also constitute sexual harassment or disability discrimination under state or federal civil rights laws does not affect the viability of a tort claim for intentional infliction of emotional distress . . . ."); *Jimenez v. Thompson Steel Co., Inc.,* 264 F. Supp. 2d 693, 696 (N.D. Ill. 2003) ("[I]f the action of the foreman in harassing Mr. Jimenez was extreme and outrageous and constituted intentional infliction of emotional distress, it would be irrelevant whether the motive for this harassment . . . [was] based on Mr. Jimenez's national origin."). Accordingly, if an employer commits extreme and outrageous conduct sufficient to give rise to an IIED claim, the IHRA does not preempt the plaintiff's IIED claim regardless of whether the motive for the misconduct was discriminatory. *See Naeem,* 444 F.3d at 603 n.4. Defendants' preemption argument, therefore, fails.

### B. Sufficiency of the Evidence

Defendants also challenge whether Plaintiff has presented sufficient evidence to survive summary judgment on his IIED claims. Plaintiff must prove the following elements to prevail on his IIED claim under Illinois law: (1) the conduct involved is "truly extreme and outrageous;" (2) the defendant "either *intend[ed]* that his conduct inflict severe emotional distress, or [knew] that there [was] at least a high probability that his conduct [would] cause severe emotional distress;" and (3) the conduct "in fact cause[d] *severe* emotional distress." *See Feltmeier v. Feltmeier,* 207 Ill. 2d 263, 269, 278 Dec. 228, 798 N.E.2d 75 (Ill. 2003) (emphasis in original) (quoting *McGrath v. Fahey,* 126 Ill. 2d 78, 86, 127 Ill. Dec. 724, 533 N.E.2d 806 (Ill. 1998)). Here, Plaintiff's IIED claims against the Individual Defendants and Sidetrack, as their employer, fail because Plaintiff presents no evidence that the Individual Defendants' conduct in fact caused him severe emotional distress. *See id.* Plaintiff's IIED claim against Johnston also fails for the separate reason that his complained-of conduct does not qualify as "extreme and outrageous." *See id.*

### 1. Plaintiff Offers No Evidence That He Suffered Severe Emotional Distress

To support an IIED claim, the emotional distress a plaintiff allegedly has suffered must be severe. "Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Welsh v. Commonwealth Edison Co.,* 306 Ill. App. 3d 148, 155, 239 Ill. Dec. 148, 713 N.E.2d 679 (Ill. App. Ct. 1999) (quoting *Public Fin. Corp. v. Davis,* 66 Ill. 2d 85, 4 Ill. Dec. 652, 260 N.E.2d 765 (Ill. 1976)); *see also Honaker v. Smith,* 256 F.3d 477, 495 & n.18 (7th Cir. 2001) (collecting cases).

Plaintiff puts forward no evidence that the Individual Defendants' alleged misconduct caused him to suffer emotional distress severe enough to meet this demanding standard. Plaintiff does not even identify the "severe emotional distress" he allegedly suffered in his opposition papers or his statement of additional facts. Indeed, Defendants—not Plaintiff—have provided the only information regarding Plaintiff's alleged distress, noting that Plaintiff testified he felt ashamed and embarrassed as a result of the incident in which Kays allegedly performed oral sex on Plaintiff against his will. (*See* Pl. Dep. 294-95; R. 48-4, 5/23/11 Pl. Personal Stmt. at DEF000075.) Shame and embarrassment do not rise to the level of "severe emotional distress" necessary to sustain an IIED claim. *See Welsh,* 306 Ill. App. 3d at 155, 239 Ill. Dec. 148, 713 N.E.2d at 679; *Honaker,* 256 F.3d at 495 & n.18. Because Plaintiff fails to identify any severe emotional distress he suffered because of the Individual Defendants' conduct, his claim for IIED cannot withstand summary judgment. *See Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the facts." (quoting *Steen v. Myers,* 486 F.3d 1017, 1022 (7th Cir. 2007))).

## 2.    Johnston's Conduct Was Not "Extreme and Outrageous"

Plaintiff's claim against Johnston fails for the additional reason that no reasonable trier of fact could find that Johnston's conduct was "truly extreme and outrageous." Courts analyze whether conduct is extreme and outrageous based on an objective standard taking into consideration the totality of the circumstances. *See Duffy v. Orlan Brook Condominium Owners Ass'n,* 2012 IL App (1st) 113577, ¶ 36, 367 Ill. Dec. 341, 981 N.E.2d 1069 (Ill. App. Ct. 2012). "[E]xtreme and outrageous behavior requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of

resentment and outrage." *Id.* Put differently, "to serve as a basis for recovery, the defendant's conduct must be such that the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Van Stan v. Fancy Colours & Co.,* 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Doe v. Calumet City,* 161 Ill. 2d 374, 392, 204 Ill. Dec. 274, 283, 641 N.E.2d 498 (Ill. 1994)).

In the employment context, Illinois courts have long recognized that "personality conflicts and questioning of job performance are 'unavoidable aspects of employment' and that 'frequently, they produce concern and distress.'" *Id.* (quoting *Heying v. Simonaitis,* 126 Ill. App. 3d 157, 166, 81 Ill. Dec. 335, 342, 466 N.E.2d 1137 (Ill. 1984)). If the distress from workplace discipline, job transfers, and terminations could form the basis of an IIED claim, "virtually every employee would have a cause of action." *See Welsh,* 306 Ill. App. 3d at 154, 239 Ill. Dec. 148, 713 N.E.2d 679. Accordingly, Illinois law limits recovery for IIED in the employment context to instances in which the employer's conduct "go[es] well beyond the parameters of the typical workplace dispute." *See Honaker,* 256 F.3d at 492.

Plaintiff's only accusations against Johnston concern Sidetrack's investigation into Plaintiff's allegations of harassment, his termination, and Sidetrack's opposition to his claim for unemployment benefits. Plaintiff does not allege that Johnston took part in any sexual or religious harassment directed at Plaintiff. The misconduct of which Plaintiff accuses Johnston, even if proven, does not meet the demanding standard for establishing "extreme and outrageous" conduct. *See Van Stan,* 125 F.3d at 569 (the employer's conduct was not sufficiently "extreme and outrageous" where the company lied to the plaintiff about the reason for his termination); *Witkowski v. St. Anne's Hosp. of Chi., Inc.,* 113 Ill. App. 3d 745, 752, 69 Ill. Dec. 581, 447 N.E.2d 1016 (Ill. App. Ct. 1983) (determining that the defendant's action of wrongfully

discharging the plaintiff in order to prevent her from securing long term disability benefits was not "extreme and outrageous"); *Vickers v. Abbott Labs.,* 308 Ill. App. 3d 393, 241 Ill. Dec. 698, 719 N.E.2d 1101 (Ill. App. Ct. 1999) (coercing the plaintiff into accepting a demotion and failing to conduct a good faith investigation into the allegations against him was not "extreme and outrageous").

## CONCLUSION

For the reasons explained above, the Court grants Sidetrack's motion for summary judgment with respect to Plaintiff's sexual harassment, retaliation, and IIED claims, but denies Sidetrack's motion with respect to Plaintiff's religious harassment claim. In addition, the Court grants the Individual Defendants' motions for summary judgment with respect to Plaintiff's IIED claims.

**Date: June 27, 2014**                    **ENTERED**

AMY J. ST. EVE
U.S. District Court Judge